NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| NR MEDIA, INC., et al., | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. 06-3988 (JAP) |
| | : | |
| v. | : | |
| | : | **OPINION** |
| TOO MUCH MEDIA, et al., | : | |
| | : | |
| Defendants, | : | |
| | : | |
| And | : | |
| TOO MUCH MEDIA, LLC, | : | |
| | : | |
| Counterclaimant, | : | |
| | : | |
| v. | : | |
| | : | |
| NR MEDIA, INC., et al., | : | |
| | : | |
| Counterclaim Defendants. | : | |

---

PISANO, District Judge.

Currently before the Court is a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) brought by Counterclaim Defendant Jason Tucker ("Tucker").  Tucker seeks a dismissal of the claims asserted against him by Defendant-Counterclaimant Too Much Media, LLC ("TMM"), which opposes the motion.  For the reasons set forth herein, the Court denies Tucker's motion to dismiss.

## I.    BACKGROUND

This dispute arises from an allegedly defamatory posting made on an internet website, in

which it was alleged that Plaintiffs NR Media, Inc. and Naked Rhino Media, LLC (collectively "NR Media" or "Plaintiffs") engaged in fraudulent conduct by failing to properly pay commissions to third-party independent contractors called "affiliates."  (Am. Cmplt. ¶¶ 1, 15).  In the online adult entertainment industry, website owners, such as Plaintiffs, may use affiliates to generate membership purchases of the entertainment website.  (Am. Cmplt. ¶ 69).  In return, the website owners pay the affiliates a percentage of the membership purchase price as commission for each solicited initial membership purchase and membership renewal, referred to as "rebills." (Am. Cmplt. ¶ 31).

To track and manage an entertainment website's billing records, Defendants Too Much Media, LLC ("TMM"), a New Jersey entity, provides software called Next-Generation Administration and Tracking Software ("NATS").  (Am. Cmplt. ¶¶ 7-10, 20-21, 67).  NATS collects that information in a report format to be sent to Affiliate Marketing Programs, usually a website separate from the entertainment website that is used to make the commission payments to affiliates.  (Am. Cmplt. ¶¶ 20-21, 67).  Specifically, "NATS handles the affiliate sign-up, statistics, traffic and sales tracking, administration functions, administration reporting, fraud detection, as well as other features."  (TMM Ans. at 18 ¶ 2).

Here, Plaintiffs are owners of various entertainment websites, as well as an Affiliate Marketing Program found at www.XclusiveCash.com ("XclusiveCash"), through which Plaintiffs paid affiliates for the solicitation of membership to Plaintiffs' entertainment websites. (Am. Cmplt. ¶¶ 4-5, 69).  Plaintiffs, having their principal place of business located in North Carolina, (Am. Cmplt. ¶¶ 4-5), entered into an oral contract in August of 2004 with TMM for a license to use NATS to report membership purchases made on Plaintiffs' entertainment websites

to XclusiveCash.  (Am. Cmplt. ¶¶ 20-21, 67).

According to Plaintiffs, on August 10, 2006, TMM, through its two partners John Albright ("Albright") and Charles Berrebbi ("Berrebbi"), posted a message on a "recognized online adult entertainment-related message board[,]" (Am. Cmplt. ¶ 25), notifying the public that, in respect of rebills, a discrepancy existed between Plaintiffs' NATS-generated reports submitted to XclusiveCash and Plaintiffs' purchase reports generated directly from a payment clearinghouse known as CCBill, (Am. Cmplt. ¶ 31; TMM Ans. at 18 ¶ 6).  That internet posting stated that, in response to the discrepancies, TMM suspended its NATS license to Plaintiffs and, thereby, "disable[d] the administration area of NATS so that the program is rendered unusable until the situation is sorted out."  (Am. Cmplt. ¶ 31).  On the same day, that posting was re-posted on numerous other online message boards used in the adult entertainment industry.  (Am. Cmplt. ¶¶ 38, 40-42, 44).  Indeed, TMM did suspend its contract with Plaintiffs sometime after this posting and ultimately terminated the contract sometime in September 2006.  (Am. Cmplt. ¶¶ 70, 72).

On August 22, 2006, Plaintiffs filed a Complaint against Defendants TMM, Albright, individually, and Berrebbi, individually (collectively, "Defendants"), asserting claims of defamation, breach of contract, false light, and intentional interference with an existing contract and with existing affiliate contracts.  (Cmplt.; Am. Cmplt. ¶¶ 50-115).  Plaintiffs allege that the August 10, 2006 online posting was defamatory in that it inaccurately accused Plaintiffs of engaging "in the under-handed practice of 'shaving' numbers (altering [membership] sign[-]up or rebill statistics) in order to cheat the [a]ffiliates of its XclusiveCash program."  (Am. Cmplt. ¶ 35).  Moreover, Plaintiffs claim that the posting and allegations of shaving damaged Plaintiffs'

business and reputation in the online adult entertainment industry.  (Am. Cmplt. ¶ 46).
According to Plaintiffs, the discrepancy in its billing records was caused by "a deficiency in the
NATS program[, a] simple computer error[,] or failure to train [Plaintiffs] appropriately after
installation of NATS."  (Am. Cmplt. ¶ 47).

On October 19, 2006, in its Answer, TMM asserted counterclaims against Plaintiffs, but
later amended those counterclaims on November 15, 2006, May 1, 2007, and July 25, 2007.  In
its Second Amended Counterclaim, TMM added as a Counterclaim Defendant No Rivals, LLC,
("No Rivals"), a successor to NR Media, and, in its Third Amended Counterclaim, added as
Counterclaim Defendants Christopher Petoski ("Petoski") and Jason Tucker ("Tucker").  TMM
seeks "to ascertain the extent of [Plaintiffs'] fraud."  (3d Am. Cc, "Count I" at 4 ¶ 14).  In
addition, TMM alleges that Petoski and Tucker committed trade libel by "maliciously and falsely
accusing TMM, to affiliates and others in the adult entertainment industry, of being the cause of
[P]laintiff[s'] failure to pay their obligations to affiliates."  (3d Am. Cc, "Count II" at 5 ¶¶ 3-4).
Finally, TMM claims that Tucker "has been threatening certain affiliates with lawsuits because
those affiliates made complaints to TMM that [P]laintiffs were not paying them money for
rebills."  (3d Am. Cc, "Count III" at 5 ¶ 2).  As a result, TMM seeks the Court to enjoin "Tucker,
his agents and employees, from making threats or otherwise attempting to intimidate affiliates or
other possible witnesses for TMM from cooperating with TMM in this litigation."  (3d Am. Cc,
"Count III" at 6).

Tucker now moves to dismiss TMM's Counterclaims pursuant to Federal Rule of Civil
Procedure 12(b)(2), arguing that the Court lacks personal jurisdiction over him because he is a
California resident and has no contacts with the State of New Jersey.  Nevertheless, Tucker

admits that he was deposed in connection with this action on December 20, 2007, and that, as President of FEI Holdings, Inc., a California entity, he maintains a contractual relationship with TMM to use NATS.  (Tucker Decl. ¶¶ 38-41, 44).  TMM opposes the motion, contending that the Court has specific jurisdiction over Tucker because, as revealed through his deposition, Tucker became partners with Petoski, and their respective wives, to form No Rivals as a successor to Plaintiffs.  TMM also submits that Tucker was actively involved in Plaintiffs' reaction to the August 10, 2006 online posting, including the decision to initiate this action in New Jersey.

## II.    DISCUSSION

### A.    Standard of Review

"[C]ourts reviewing a motion to dismiss a case for lack of in personam jurisdiction must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff."  *Carteret Sav. Bank, F.A. v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992).  "[O]nce the defendant raises the question of personal jurisdiction," however, "the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction."  *Id.* at 146.

"A federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state."  *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 436 (3d Cir. 1987); *see also* Fed. R. Civ. P. 4(k). The New Jersey long-arm rule, New Jersey Court Rule 4:4-4(b), "extends to the limits of the Fourteenth Amendment Due Process [Clause] protection."  *Carteret*, *supra*, 954 F.2d at 145.  In accordance with that protection, a court may exercise personal jurisdiction over a nonresident

defendant if that defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

Whether sufficient minimum contacts exist to assert personal jurisdiction depends upon "the nature of the interactions and type of jurisdiction asserted." *Telcordia Tech Inc. v. Telkom SA Ltd.*, 458 F.3d 172, 177 (3d Cir. 2006). Indeed, two forms of personal jurisdiction exist: general and specific. *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007). Where the cause of action "does not arise out of or relate to the [defendant]'s activities in the forum State," but the defendant has "continuous and systematic" contacts with the forum state sufficient to confer personal jurisdiction, a court is said to exercise general jurisdiction over the defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 & n.9 (1984).

If continuous and systematic contacts do not exist, a court nonetheless exercises specific jurisdiction over a defendant when the action brought against him arises out of or relates to those contacts. *Id.* at 414 n.8. Specific jurisdiction exists if: (1) the defendant had "purposefully directed his activities at the forum[;]" (2) the plaintiff's claim "arise[s] out of or relate[s] to at least one of those specific activities[;]" and (3) the exercise of jurisdiction "comports with fair play and substantial justice." *Marten*, *supra*, 499 F.3d at 296 (internal citations, quotation and editing marks omitted). "Because this analysis depends on the relationship between the claims and contacts, [courts] generally evaluate specific jurisdiction on a claim-by-claim basis." *Ibid.*

Irrespective of whether a plaintiff asserts personal jurisdiction under the general or specific jurisdiction theory, a plaintiff must demonstrate that the defendant "has purposefully directed its activities toward the residents of the forum state, or otherwise 'purposefully avail[ed]

-6-

itself of the privilege of conducting activities within the forum State, thus invoking the benefits

and protections of its laws.'" *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir. 1998)

(quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)) (internal citation omitted).

###### B.      Analysis

Applying those principles of law to this case, TMM must establish that the Court has *in*

*personam* jurisdiction over Tucker by virtue of his contacts with New Jersey.  Specifically,

accepting as true all of its allegations, TMM must establish that: (1) Tucker had continuous and

systematic contacts with New Jersey; (2) the present action arises out of, or relates to, particular

conduct by Tucker within New Jersey; or (3) Tucker committed an intentional tort expressly

aimed at New Jersey.  TMM must also show that Tucker purposefully availed himself of New

Jersey's benefits and privileges through his conduct with this State.

Tucker argues that TMM has failed to satisfy any of those requirements.  TMM, in

opposition, submits that the Court has specific personal jurisdiction over Tucker because the

present action arises out of Tucker's particular conduct within, and aimed at, New Jersey.

Specifically, TMM points to the relationship between Tucker and Petoski, a principal to NR

Media, Tucker's role as principal to No Media, a successor to NR Media, and Tucker's alleged

interference with TMM's ability to defend the claims asserted by Plaintiffs in this action.  As a

result, because TMM does not contest that the Court lacks general personal jurisdiction over

Tucker, the Court considers only whether specific personal jurisdiction exists and, accordingly,

analyzes whether personal jurisdiction exists over each claim asserted against Tucker.

TMM asserts two of its three claims against Tucker: trade libel and malicious interference

with TMM's ability to obtain possible witnesses to defend NR Media's Complaint.  Because

these claims are for intentional torts allegedly committed against Plaintiff, the Court must

consider the existence of personal jurisdiction under the "effects test" established in *Calder v.*

*Jones*, 465 U.S. 783 (1984).  *See IMO Indus.*, *supra*, 155 F.3d at 260-61.  Pursuant to that test, "a

court may exercise personal jurisdiction over a nonresident defendant who commits an

intentional tort by certain acts outside the forum which have a particular type of effect upon the

plaintiff within the forum."  *Id.* at 261.  Under the law of this Circuit, the effects test requires a

plaintiff to demonstrate that:

> (1) The defendant committed an intentional tort;
> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be
> said to be the focal point of the harm suffered by the plaintiff as a result of that tort;
> [and]
> (3) The defendant expressly aimed his tortious conduct at the forum such that the
> forum can be said to be the focal point of the tortious activity[.]

*Id.* at 265-66 (footnote omitted).  Moreover, a plaintiff's mere assertion "that the defendant knew

that the plaintiff's principal place of business was located in the forum [is] insufficient" to satisfy

the third prong of the test.  *Id.* at 265.

Here, sometime in August of 2006, Tucker entered into an oral agreement with Petoski,

whereby they would become partners, along with their wives, in an entity combining NR Media

and its websites, (Kreizman Cert., Ex. A ("Tucker Dep.") at 8-12, 42), with Tucker's "personal

relationships" in the online adult entertainment industry, (Kreizman Cert., Ex. B ("Petoski Dep.")

at 33, *ll.*10-11, 34, *ll.*3-6).  That new entity became No Rivals.  (Tucker Dep. at 9, *l.*10).  Either

based on that business relationship or on the friendship between Tucker and Petoski, (Tucker

Dep. at 8, *l.*5), when Petoski received a phone call from TMM about NR Media's discrepancy in

billing reports, Petoski immediately telephoned Tucker to inform him of the situation.  (Tucker

Dep. at 21, *l*.18).  In response, Tucker advised Petoski that they should each notify their attorney to determine the proper course of action.  (Tucker Dep. at 21, *ll*.23-25).

Moments later, after speaking with their attorneys, Tucker "suggested" a conference telephone call between himself, Petoski, and Albright, a TMM partner.  (Tucker Dep. at 23, *ll*.15, 19).  During that conference call, Tucker became intimately involved with the subject matter of this action. (Tucker Dep. at 23-24).  In respect of that phone conversation, Tucker averred the following:

> I wanted to know what was going on and what had happened.  [Albright] explained to me that there appeared to be a rebill issue.  I had asked before anything else happened to have some time to figure out what was going on on both sides.  We had requested that they send over whatever information they had to help us conduct a research, or conduct research, and then I believe we agreed to regroup . . . .

(Tucker Dep. at 23, *ll*.24-25, 24, *ll*.1-6).  Shortly after this phone conversation, Tucker saw the allegedly defamatory statement made by TMM on the online posting, (Tucker Dep. at 24), and immediately notified Petoski of the posting, ordering him to "'[c]all the attorneys[,]'" (Petoski Dep. at 78, *ll*.14-25).

Indeed, just twelve days later, Plaintiffs filed the present action in this Court, availing themselves of the benefits and privileges of New Jersey.  Although Tucker is not a named Plaintiff, he has been intimately involved with the action.  Tucker testified at his deposition that he had spoken to at least four people "to become . . . witnesses for the plaintiffs in this matter[.]" (Tucker Dep. at 102, *ll*.2-9).  In addition, Tucker actively "participate[d] in coming up with a damage calculation for [P]laintiffs[,]" (Tucker Dep. at 117, *ll*.2-4), by determining Plaintiffs' average growth pattern and ascertaining the difference between the revenue Plaintiffs could have expected if it continued on its growth rate established before the allegedly defamatory posting

and the revenue Plaintiffs did in fact receive after the posting, (Tucker Dep. at 118-119).  In fact,

Tucker had been "asked to be the expert to speak about [certain elements of] damages" on behalf

of Plaintiffs.  (Tucker Dep. at 119, *ll.*21-23).

In addition, TMM alleges that Tucker terminated business relations with an affiliate,

whom Tucker learned, through his attendance at a deposition taken as part of this action, had

made a complaint to TMM regarding Plaintiffs' failure to pay him.  (Tucker Dep. at 99-101).

According to an online instant message conversation recorded on April 28, 2007 at 2:59 am,

Tucker wrote to this affiliate:

> information that was revealed in the deposition this week by TMM caused us to
> termination [sic] of your account.  That and your attitude and needs are not worth the
> 100 clicks a day.  Tell your friends, Jace, XXXotic and StauartD that they can expect
> a process server in the near future.  FYI TMM's att[orne]y asked why we hadn[']t
> sued you yet.

(Kreizman Cert., Ex. C).

In light of those facts, and construing as true TMM's pleadings, the Court initially finds

that TMM has met the first two prongs of the effects test.  Trade defamation and witness

intimidation are intentional torts, and Tucker directly aimed his tortious conduct at TMM, a New

Jersey entity, such that TMM felt the brunt of the tortious conduct in New Jersey.  *See Remick v.

Manfredy*, 238 F.3d 248, 258 (3d Cir. 2001) (finding that individual feels brunt of harm from

defamatory remarks aimed at his professional activities in the forum where he centers his

professional activities).  Moreover, also accepting as true TMM's allegation that Tucker has been

interfering with TMM's defense, the Court finds that TMM "felt the brunt of the harm in [New

Jersey] such that [New Jersey] can be said to be the focal point of the harm suffered by [TMM]

as a result of " Tucker's intimidation of possible witnesses.  *IMO Indus.*, *supra*, 155 F.3d at 265.

Next, the Court also concludes that TMM has met the third prong of the effects test; indeed, Tucker "expressly aimed his tortious conduct at [New Jersey] such that [New Jersey] can be said to be the focal point of the tortious activity[.]" *Id.* at 266.  Apart from Tucker's knowledge that TMM's principal place of business is located in New Jersey, the Court emphasizes Tucker's involvement with the initiation and prosecution of Plaintiffs' Complaint against TMM and its principals.  The facts reveal that Tucker made phone calls to Albright, who is located in New Jersey, in connection with the underlying action.  *Cf. id.* at 267 (considering, under third prong of effects test, fact that defendant "never placed a phone call" to plaintiff in forum).  Although it has been made clear "that a few calls or letters into the forum may be of only marginal import if the dispute is focused outside the forum[,]" in this instance, these phone calls indicate Tucker's immediate interest in this litigation and his role in instituting the present action in New Jersey.  *Id.* at 268.  Moreover, it cannot be said that TMM's dispute with Tucker is not focused within New Jersey, where Tucker aimed his allegedly libel comments at a New Jersey entity and allegedly interfered with that entity's defense of a New Jersey action.

Finally, considering Tucker's close relationship with, and interest in, the underlying action between NR Media and TMM, and the fact that NR Media chose New Jersey as the forum to bring its present Complaint, the Court holds that Tucker has purposefully availed himself of the privilege of conducting activities within New Jersey, "invoking the benefits and protections of its laws." *Id.* at 259 (internal quotation marks omitted).  Accordingly, Tucker is a "primary participant[] in an alleged wrongdoing intentionally directed at a [New Jersey] resident, and jurisdiction over [him] is proper on that basis." *Calder*, *supra*, 465 U.S. at 790.

**III.     CONCLUSION**

For the reasons expressed above, the Court denies Tucker's motion to dismiss pursuant to

Federal Rule of Civil Procedure 12(b)(2).  An appropriate order accompanies this Opinion.


                                        /s/ Joel A. Pisano_____
                                        JOEL A. PISANO, U.S.D.J.


Dated: February 25, 2008